IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2020

**IN RE RAHJADA W., ET AL.**

**Appeal from the Circuit Court for Blount County**
**No. E-28597  Tammy M. Harrington, Judge**

_____

**No. E2019-01798-COA-R3-PT**
_____

This appeal involves a petition to terminate parental rights to three children. The trial court found there was clear and convincing evidence to terminate on multiple grounds and that termination is in the best interest of the children. Only the mother appealed. We affirm the trial court's decision to terminate the mother's parental rights and remand.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and FRANK G. CLEMENT, JR., P.J., M.S., joined.

Nanette J. Landen, Knoxville, Tennessee, for the appellant, Alaina W.

Herbert H. Slatery, III, Attorney General and Reporter; and Lexie Ashton Ward, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

### I.  FACTS & PROCEDURAL HISTORY

Alaina W. ("Mother") has three minor children, S.W., S.W., and R.W. (collectively "the children").[1] While the children's birth certificates do not list a father, it

_____

[1] In juvenile court actions, to protect the privacy of children, the policy of this Court is to use only the first name and last initial (and in some cases, just the initials) of the parties involved. *In re C.W.*, 420 S.W.3d 13, 15 n.1 (Tenn. Ct. App. 2013).

is undisputed that Stephen S. ("Father") is the putative father of all three children. [2] This appeal involves only Mother's parental rights since Father did not file an answer, appeal, or appear in any prior proceedings in this case.

Prior to leaving the physical custody of their parents, the children lived in Texas with Mother and Father. Throughout her relationship with Father, Mother was the victim of domestic violence. After an unspecified period of time, Mother sent the children to live with a friend in Texas. While the children lived with the friend, the children's maternal grandmother, Anita Y. ("Grandmother"), sent financial support to the friend, intending for it to benefit the children. At the end of 2015, after learning the funds were not being used to support the children, Grandmother drove to Texas, picked up the children, and returned to Tennessee. Mother remained in Texas where she continued to suffer domestic violence at the hands of another man, Norman B. Although she remained in Texas, Mother retained legal custody of the children.

In 2017, the Tennessee Department of Children's Services ("DCS") received multiple reports of inadequate supervision by Grandmother. On May 18, 2017, DCS filed a petition for dependency and neglect in the Juvenile Court of Blount County, Tennessee. On the same day, the juvenile court entered a protective order granting temporary custody of the children to DCS. Brad Taylor was appointed as DCS case manager for all three children. Shortly thereafter, Mother was made aware that the children were in DCS custody. Initially, all three children were placed in the same foster home, but the older two children were later moved together to five foster homes. On March 9, 2018, the juvenile court found there was clear and convincing evidence to show the children were dependent and neglected.

Mother remained in Texas for approximately ten months after DCS took custody of the children. Mother asserts Norman B. forced her to remain in Texas, claiming he would lock her inside their home and take certain personal belongings from her. Despite these assertions, Mother made two trips to Tennessee before moving back permanently. Two of the trips included visits with the children under DCS supervision. The visits took place in December 2017 and September 2018. [3] Without the consent of DCS, Mother brought unauthorized visitors (other family members) to both visits. Mr. Taylor described both visits as being of "incredibly poor" quality. At the first visit, the two youngest children (ages eight and four years old at the time) had to be reminded who their mother was. At the same visit, two of the children played on their own without much interaction with Mother. Mother spent most of the second visit "Facetiming" another child on her phone in a corner of the room.

---

[2] Several of the filings list a fourth child, but due to that child's age and lack of abuse, he is no longer in custody of DCS and is not a subject of this case.

[3] Mother's first visit in December 2017 was the first time she had seen the children in approximately two years.

On August 1, 2017, the initial Family Permanency Plan was created. It was approved and incorporated into an order by the Juvenile Court on October 2, 2017. Mother was not present for the plan's creation, but a copy was mailed to her address in Texas. Subsequent plans modified the original, with the final plan being drafted on February 4, 2019. Through these plans, Mother was required to accomplish several tasks: (1) provide legal and safe transportation for her children or provide DCS with a transportation plan; (2) submit to a background check; (3) attend an alcohol and drug assessment and follow its recommendations; (4) attend a parenting assessment and follow its recommendations; (5) attend a mental health assessment and follow its recommendations; (6) maintain contact with DCS; (7) resolve her existing legal obligations; (8) refrain from committing illegal acts in the future; (9) obtain stable and safe housing for her and her children; (10) obtain a legal and sustainable income and provide proof of such to DCS; (11) submit to random drug screens; (12) complete a domestic violence victim course, which could be accomplished through therapy; and (13) be an active participant in decisions regarding the children. Mother was made aware of the requirements in each plan by DCS mailing copies to her address, by Mother speaking on the phone with Mr. Taylor, or by Mother meeting in-person with Mr. Taylor. The juvenile court ratified the final plan on May 6, 2019.

After DCS took custody of the children, Mr. Taylor made numerous attempts to help Mother satisfy her duties under the permanency plan. Mr. Taylor stated he called multiple facilities in Texas where Mother could complete her parenting assessment and alcohol and drug assessment, paid for by DCS. He also arranged for Mother to travel back to Tennessee by obtaining one-way bus passes, paid for by DCS.[4] Once back in Tennessee, Mr. Taylor arranged for her to live at a domestic abuse shelter in Knoxville.

Despite the efforts made by DCS and Mr. Taylor, Mother completed only a few of the requirements in the permanency plan.

Mother completed the parenting assessment, which included a drug and alcohol assessment, but did not follow the assessment's recommendations. The assessor expressed concerns with the inconsistencies in her answers. The assessor believed Mother was not being honest in answering the questions, such as marking "zero" for past traumas and history of drug use. When questioned about why she did not follow through on the individual therapy suggested after completing the assessment, Mother stated, "If I'm going for parenting, . . . can't nobody teach me how to be a parent. I teach myself." Additionally, Mother did not provide a transportation plan to DCS.[5] She also did not

---

[4] According to Mr. Taylor, before Mother used a bus pass to permanently move back to Tennessee, she refused the passes, stating "[s]he felt that it was a claustrophobic situation" and that "she didn't want to be trapped on a bus for that long."

[5] Mother claims she is in the process of paying off previous fines to re-obtain her driver's license and that an older child is helping with transportation, but no proof of these payments or a written plan was

complete her domestic violence victim classes or education group. Mother attended one session of domestic violence victim group therapy before walking out half way through. When she reported that the group classes were too emotionally jarring for her, Mr. Taylor arranged for her to complete the task through individual counseling. However, Mother failed to attend the scheduled appointments, claiming she had a work conflict. Further, until the morning of trial, Mother did not provide written proof of her employment or housing.

On January 25, 2019, over a year and a half after DCS took custody of the children, Mother returned from Texas to live in Tennessee. Shortly after her return, Mother spent 45 days in Sevier County Jail for pleading guilty to possession of stolen property and vandalism charges. After being jailed in Sevier County, she spent two weeks in Knox County Jail after pleading guilty to a 2009 forgery charge. Then Mother was transferred to Blount County Jail for pleading guilty to a 2007 charge of driving on a suspended license. Upon being released from Blount County Jail in early April 2019, Mother requested to visit the children. Mr. Taylor conferred with the children's therapists on whether to approve visitation. The therapists recommended against visitation. Heeding the therapist's recommendation, Mr. Taylor denied Mother visitation. Shortly thereafter, on April 8, 2019, DCS filed a Petition to Terminate Parental Rights.

Kelly Wojciechowski was appointed as the children's guardian ad litem. Based on the recommendations of DCS and the therapist, Ms. Wojciechowski moved to temporarily suspend Mother's visitation. The juvenile court granted the motion, suspending visitation, subject to a final hearing. An initial appearance was made before the circuit court on May 21, 2019, and Mother was appointed counsel the following day. A final hearing on the Petition to Terminate Parental Rights was set for August 19, 2019.

Prior to the final hearing, in July 2019, Mother submitted to a drug screen. Mother tested positive for Methamphetamine. When asked about her drug use, Mother did not deny using drugs in July 2019 but stated that she was unaware it was Methamphetamine. Mother stated that she was partying over a three-day weekend when she took the drug, believing it was Ecstasy.

The circuit court conducted the final hearing on the petition for termination on August 19, 2019. Three witnesses testified: Mr. Taylor; Heather Cupp, a licensed social worker whose focus is child and adolescent development; and Mother. Mother stated that she had been working at Rubbermaid for approximately four months, earning $12.50 per hour. As proof of this employment, Mother provided copies of two months of paycheck stubs. Mother's lease, which she executed twelve days prior, was for a two-bedroom unit and listed one adult and zero children as the only occupant. Despite the written language of the lease, Mother stated the landlord knew she had children and that he would allow

provided to DCS.

- 4 -

them to stay in the apartment with her. If the children were to live there with her, Mother stated the oldest daughter would sleep in one bedroom, the two youngest would sleep in another, and Mother would sleep on a couch. Mother claimed she faxed a copy of the lease to Mr. Taylor prior to trial. However, Mr. Taylor testified that the first time he saw a written copy of the lease was the morning of trial.

Mr. Taylor testified on the history of this case, his efforts to help Mother complete the permanency plans, the children's needs and progression, and his recommendation for the court. Mr. Taylor stated the children expressed a desire to remain with their current foster families. He noted that the children are "starkly different" than when they entered custody. Mr. Taylor credited the improvements in large part to the foster placements of each child, which were selected based on their individual needs. He stated that the children continued to improve through therapy sessions with Ms. Cupp. He further testified that he believed it is in the best interest of the children to terminate Mother's (and Father's) parental rights rather than subjecting the children to a "constant state of turmoil."

Ms. Cupp testified to the children's behavioral issues and progress while in foster care. At the time of trial, Ms. Cupp had worked with the two youngest children for approximately five months and with R.W. for a few weeks. Due to the short period of therapy, Ms. Cupp stated that R.W. was still in the assessment phase. Through the therapy sessions, Ms. Cupp determined that the two youngest daughters faced significant behavioral issues, PTSD, and developmental delays. She also noted that all three children are avoidant and reluctant to discuss Mother. When Ms. Cupp would bring up Mother in the course of a conversation, the girls would become agitated, change energy levels, or "check out" of the conversation. Speaking directly in regard to the two youngest children, Ms. Cupp's recommendation was for the children to maintain consistency and permanency in the placement of their current homes. In her opinion, it would be "very harmful" to the children to change their caregivers.

Mother's testimony verified the majority of the case's history and offered explanations for some of her actions. She explained that she answered zero to domestic violence trauma on her parenting assessment because she was no longer dealing with the trauma. Yet, she admitted that she walked out of the domestic violence victims group therapy because it was too difficult to deal with. Mother dismissed her shoplifting incident by placing the majority of the blame on the woman she was with when the incident occurred, stating she knew what the woman was doing but did not shoplift herself. Mother also placed most of the blame on Mr. Taylor and DCS for her not completing most of the permanency plan. In her opinion, DCS could have done more to help her find housing and set up assessments in Texas. Mother did admit that she has not provided financial support for the children since they left her physical custody. She claimed she intended to provide support but that DCS did not file a case, so she "technically" did not have a case to pay on.

The circuit court rendered an oral ruling at the close of the final hearing. The court found DCS met its burden to terminate Mother's parental rights on four separate grounds: (1) abandonment for failure to provide a suitable home; (2) substantial noncompliance with the permanency plan; (3) persistence of conditions; and (4) failure to manifest an ability to parent.[6] The court applied the factors listed in Tennessee Code Annotated section 36-1-113(i) and found it was in the best interest of the children to terminate Mother's parental rights. A final written order was entered on September 10, 2019. Mother has appealed to this Court.

## II.    ISSUES PRESENTED

Mother presents five issues on appeal.

1. Whether the trial court erred in finding abandonment for failure to provide a suitable home;

2. Whether the trial court erred in finding the ground of substantial non-compliance with the permanency plan;

3. Whether the trial court erred in finding the ground of persistent conditions;

4. Whether the trial court erred in finding a failure to manifest by act or omission an ability and willingness to personally assume legal and physical custody or financial responsibility for the children; and

5. Whether the trial court erred by finding that termination of Mother's rights is in the best interest of the children.

For the reasons stated herein, the decision of the circuit court is affirmed and remanded.

## III.    STANDARDS IN TERMINATION CASES

"A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). However, parental rights are not absolute. *Id.* at 522.

A petitioner seeking to terminate the parental rights of another must prove two

---

[6] DCS originally listed abandonment for failure to visit as a ground for termination of Mother's rights, but it conceded this ground on the day of trial due to her incarceration.

elements. *In re Kaliyah S.*, 455 S.W.3d 533, 552 (Tenn. 2015). The petitioner must prove (1) at least one statutory ground for termination in Tennessee Code Annotated section 36-1-113(g), and (2) that termination of parental rights is in the best interest of the child. *Id.* In making the best interest determination, a court must consider the factors listed in Tennessee Code Annotated section 36-1-113(i). *In re Carrington H.*, 483 S.W.3d at 535, 538–39. A petitioner seeking termination must prove both elements by clear and convincing evidence. *See, e.g.*, *id.* at 522; *In re Kaliyah S.*, 455 S.W.3d at 552. Meaning, the evidence must "enable[] the fact-finder to form a firm belief or conviction regarding the truth of the facts, and [it must] eliminate[] any serious or substantial doubt about the correctness of these factual findings." *In re Carrington H.*, 483 S.W.3d at 522 (quoting *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)).

In parental termination cases, we review the trial court's findings of fact de novo with a presumption of correctness. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 524; *In re Bernard T.*, 319 S.W.3d at 596. Conclusions of law are also reviewed de novo but with no presumption of correctness. *Carrington H.*, 483 S.W.3d at 524; *In re Bernard T.*, 319 S.W.3d at 597.

## IV. DISCUSSION

Pursuant to the Supreme Court's decision in *In Re Carrington H.*, "in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings." 483 S.W.3d at 525–26. In this case, the trial court found there were four grounds for termination of Mother's parental rights. Therefore, we shall address each ground in turn.

### A. Grounds for Termination

### 1. Abandonment for Failure to Provide a Suitable Home

Tennessee Code Annotated section 36-1-113(g)(1) lists "abandonment" as one possible ground for termination of parental rights. Under certain circumstances, "abandonment" can include a parent failing to obtain and sustain a suitable home for the child after the child is removed from the physical or legal custody of the parent. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii).[7] Termination on this ground "requires a finding . . . that a parent failed to provide a suitable home for his or her child even after DCS assisted that parent in his or her attempt to establish a suitable home." *In re Jamel H.*,

---

[7] Prior versions of this subsection required a child to be "removed from the home of the parent." *See, e.g.*, *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *5 (Tenn. Ct. App. Jan. 16, 2020) (discussing prior cases). Currently, section 36-1-102(1)(A)(ii) applies when a child is removed from the home, legal custody, or physical custody of the parent. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(a). This amendment was in effect prior to DCS filing its petition in this case.

E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6 (Tenn. Ct. App. July 13, 2015) (citing Tenn. Code Ann. § 36-1-102(1)(A)(ii)). In assisting the parent, DCS must make "reasonable efforts" by utilizing its superior resources and training to assist the parent in finding a home. *In re Matthew T.*, No. M2015-00486-COA-R3-PT, 2016 WL 1621076, at *7 (Tenn. Ct. App. Apr. 20, 2016); *In re Jamel H.*, 2015 WL 4197220, at *6. "Reasonable efforts entail more than simply providing parents with a list of service providers and sending them on their way." *In re Matthew T.*, 2016 WL 1621076, at *7 (quoting *Dep't of Children's Servs. v. Estes*, 284 S.W.3d 790, 800–01 (Tenn. Ct. App. 2008)). DCS will be found to have made "reasonable efforts" if its actions are equal to or greater than the parent's. Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). DCS must make these "reasonable efforts" for a four-month period following the removal of the children. *See id.*; *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *13 (Tenn. Ct. App. Dec. 15, 2016).[8]

In making efforts to establish a home, the parent must provide "more than an adequate physical space." *In re Matthew T.*, 2016 WL 1621076, at *7; *In re A.D.A.*, 84 S.W.3d 592, 599 (Tenn. Ct. App. 2002). A suitable home includes adequate care and attention being given to the child. *In re Matthew T.*, 2016 WL 1621076, at *7.

In the present case, the children were in the physical custody of Grandmother, but in the legal custody of Mother at the time of removal. DCS was awarded legal and physical custody of the children in the course of the dependency and neglect action on May 18, 2017. The trial court found DCS made numerous efforts to help Mother move from Texas to Tennessee. Based on Mr. Taylor's testimony, which was largely undisputed by Mother, we agree. After DCS was awarded custody of the children, Mr. Taylor provided Mother with bus passes on multiple occasions, arranged for her to stay at a domestic abuse shelter in Knoxville, and made multiple attempts to contact her to track her progress and needs. Mr. Taylor testified that helping a parent move to Tennessee from another state was not a normal course of action for DCS. His doing so indicates DCS used its heightened resources and insight to try and help Mother reunite with the children. Mr. Taylor also ensured Mother's travel and initial board would be free of charge to her.

In contrast, before and after the children entered DCS custody, Mother continued to live in homes filled with domestic violence. She claims she was forced to remain in Texas by her abuser, Norman B. Yet, she was able to travel to Tennessee on two separate occasions before moving back in January 2019. We must agree with the trial court that, prior to January 2019, there is "no proof that [Mother] made any effort at all" to find a

---

[8] "As we have explained in other cases, the statute under present consideration 'does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal.'" *In re H.S.*, No. M2019-00808-COA-R3-PT, 2020 WL 1428777, at *7 n.4 (Tenn. Ct. App. Mar. 20, 2020) (quoting *In re Jakob O.*, 2016 WL 7243674, at *13).

suitable home. Even once Mother returned to Tennessee, her actions do not compare to the efforts made by DCS.

The lease Mother entered into on August 7, 2019 does not show that she has established a suitable home for the children. The lease shows nothing more than a "brick and mortar home" for Mother, listing one adult and zero children as the only permitted inhabitants. Due to Mother's failure to provide DCS with timely notice of her dwelling, DCS did not have an opportunity to inspect the home before the hearing. Additionally, Mother admitted to partying and taking illicit drugs within a month of trial. We believe this may indicate her home will not be free from illicit drugs or that Mother is unwilling to provide a stable home for the children. *See, e.g.*, *In re Matthew T.*, 2016 WL 1621076, at *7; *In re Aaralyn O.*, No. W2017-01411-COA-R3-PT, 2018 WL 468246, at *1, *7 (Tenn. Ct. App. Jan. 18, 2018) (holding the father's continued drug use after the children were removed from his physical custody evidenced he was "either unable or unwilling to maintain a safe and stable home"). Mother's decision to forgo domestic violence victim therapy and her discrediting the value of parental counseling further demonstrate her lack of effort to establish a healthy home for the children. *See In re Matthew T.*, 2016 WL 1621076, at *7 (quoting *In re M.F.O.*, No. M2008-01322-COA-R3-PT, 2009 WL 1456319, at *5 (Tenn. Ct. App. May 21, 2009)) (stating "a parent's compliance with counseling requirements is 'directly related to the establishment and maintenance of a suitable home'").

For these reasons, we find that DCS made reasonable efforts to help Mother establish a suitable home for the children and that Mother's efforts do not match those of DCS. The record shows by clear and convincing evidence that Mother has failed to provide a suitable home for the children. As a result, grounds exist for termination of her parental rights under Tennessee Code Annotated sections 36-1-113(g)(1) and -102(1)(A)(ii).

### 2. Substantial Noncompliance with the Permanency Plan

Termination of parental rights may occur under Tennessee Code Annotated section 36-1-113(g)(2) if "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan." *In re Jamel H.*, 2015 WL 4197220, at *7 (citing Tenn. Code Ann. § 36-1-113(g)(2)) (alteration in original). Such plans are developed to ensure each foster child is cared for and the parent's responsibilities under the plan help serve the child's needs. *See id.* Termination may occur for substantial noncompliance if the plan's requirements are "reasonable and related to remedying the conditions which necessitate[d] foster care placement." *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002). *See also In re Ronon G.*, 2020 WL 249220, at *8; *In re Jamel H.*, 2015 WL 4197220, at *7; *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). If the trial court does not make a finding on the plan's reasonableness, this Court will review the issue de novo. *In re Jamel H.*, 2015 WL

4197220, at *7 (citing *In re Valentine*, 79 S.W.3d at 547).

To terminate parental rights under this subsection, a parent's noncompliance with a permanency plan must be "substantial." "Determining whether a parent has *substantially complied* with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and 'going through the motions' does not constitute substantial compliance." *In re Carrington H.*, 483 S.W.3d at 537 (citing *In re Valentine*, 79 S.W.3d at 547) (emphasis added). More proof is required than showing "that a parent has not complied with every jot and tittle of the permanency plan." *In re Ronon G.*, 2020 WL 249220, at *8 (quoting *In re M.J.B.*, 140 S.W.3d at 656). "Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Dep't of Children's Servs. v. T.M.B.K.*, 197 S.W.3d 282, 293 (Tenn. Ct. App. 2006). Instead, DCS must show "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *In re M.J.B.*, 140 S.W.3d at 656 (citing *In re Valentine*, 79 S.W.3d at 548–59; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at *12 (Tenn. Ct. App. June 3, 2003)).

Turning to the ruling in this case, the trial court found substantial noncompliance with the permanency plan. The plan required Mother to accomplish the following tasks: obtain legal and safe transportation or provide DCS with a transportation plan, resolve her legal issues and refrain from participating in illegal activities in the future, attend an alcohol and drug assessment and follow its recommendations, attend parenting and mental health assessments and follow their recommendations, obtain stable and safe housing for her and the children, obtain a legal income and provide proof of such to DCS, and complete a domestic violence victim course. The children were brought into DCS custody as a result of Mother failing to provide a safe home for them to live in and because they were not given adequate care and supervision. From our review of the record, we find Mother's obligations under the permanency plan to be reasonably related to the conditions that necessitated DCS taking custody of the children. *See In re Valentine*, 79 S.W.3d at 547.

Although Mother made some progress completing the requirements of the plan, in total her actions have resulted in substantial noncompliance. At trial, Mother testified to working at Rubbermaid for the past four months, earning $12.50 per hour. However, Mr. Taylor and DCS did not receive written verification of her employment until the morning of trial. Even then, the pay stubs presented by Mother only showed employment in June and July 2019. Also, Mother resolved many of her past legal troubles upon her return to Tennessee. However, her incarceration for those prior cases, came after she plead guilty to possession of property and vandalism charges in 2019. Her attorney's claim that Mother's shoplifting incident was the result of her being "in the wrong place at the wrong time" is not a sufficient justification for her actions. She was noncompliant with the

- 10 -

permanency plan's requirement that she refrain from participating in illegal activities. She violated this requirement again when she "partied all night" over a three-day period in July while partaking in ecstasy.[9] She also admitted to "using" substances in December of 2018. Despite Mother taking accountability for her prior issues, her recent actions seem to follow a pattern of participation in illegal activity.

Despite DCS's efforts to aid Mother in completing her assessments and therapy, she did not comply with those portions of the permanency plan. DCS first arranged for Mother to complete her parenting assessment in Texas. Mother eventually completed the assessment, which included a drug and alcohol assessment, but her responses were heavily questioned. The assessor expressed concerns to Mr. Taylor that Mother "sped through" the assessment and was not honest with many of her answers. DCS also made significant efforts to help Mother complete her domestic violence victim class by arranging individual therapy, but Mother did not attend the therapy sessions. When asked about whether she would be open to individual therapy, her responses were perplexingly inconsistent. Initially, she stated, "If I'm going for parenting, no, can't nobody teach me how to be a parent." Later, she tried to explain the comment by stating, "You can't teach something that [is] already in me. . . . [B]eing a mother is already in me." Mother's refusal to be honest and forthcoming in completing the assessments, and her subsequent refusal to follow their recommendations was a failure to comply with the responsibilities required of her in the permanency plan.

Considering the children were removed from Mother's legal custody due to unstable and unsafe living conditions and due to her lack of stability as a parent and provider, we cannot say her noncompliance with the permanency plan was trivial or minor. *See T.M.B.K.*, 197 S.W.3d at 293. For many of the permanency plan's crucial requirements, Mother either did not comply, was untruthful, or waited until the morning of trial to offer written proof, which was not without its faults. When presented with new information on the morning of the hearing, it was impossible for DCS to investigate Mother's new home or income. In light of these circumstances, we find Mother's noncompliance to be substantial. *See In re M.J.B.*, 140 S.W.3d at 656. Her actions demonstrate she is unwilling or unable to "resume caring for [the] children" on a long-term basis. *See In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *3 (Tenn. Ct. App. May 31, 2018). Mother was made aware of the original permanency plan and its subsequent revisions by receiving mailed copies of the plan or discussing the plan directly with Mr. Taylor. Therefore, we find there is clear and convincing evidence to show substantial noncompliance with the permanency plan.

### 3. Persistence of Conditions

---

[9] Mother dismisses her testing positive for Methamphetamine by explaining she believed it to be Ecstasy at the time she took it. We cannot dismiss this supposed confusion as easily since both are illicit drugs.

We next address the trial court's findings regarding persistence of conditions. This ground for parental termination applies when:

> The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
> (i)   The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
> (ii)   There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
> (iii)   The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3)(A).

"A parent's continued inability to provide fundamental care to a child, even if not willful, . . . constitutes a condition which prevents the safe return of the child to the parent's care." *In re Navada N.*, 498 S.W.3d 579, 605 (Tenn. Ct. App. 2016) (omission in original) (quoting *In re A.R.*, No. W2008-00558-COA-R3-PT, 2008 WL 4613576, at *20 (Tenn. Ct. App. Oct. 13, 2008)). A parent's inability to eliminate the conditions that led to a child's removal need not be willful. *Id.* at 606 (citing *In re T.S. & M.S.*, No. M1999-01286-COA-R3-CV, 2000 WL 964775, at *6 (Tenn. Ct. App. July 13, 2000)); *In re Jaylah W.*, 486 S.W.3d 537, 555–56 (Tenn. Ct. App. 2015). When efforts made by DCS to help "improve the parenting abilities, offered over a long period of time, have proved ineffective, the conclusion that there is little likelihood of such improvement as would allow the safe return of the child to the parent in the near future is justified." *In re T.S. & M.S.*, 2000 WL 964775, at *7.

Mother argues she has remedied the conditions that led to the children's removal by returning to Tennessee and no longer living in an abusive household. The trial court concluded that the children entered DCS custody and were adjudged dependent and neglected due to a pattern of Mother's unstable housing, her lack of support for the children, her prior drug use, her prior legal issues, and inadequate supervision of the children. We agree with the trial court's findings.

- 12 -

The children entered DCS custody on May 17, 2017. They were adjudged dependent and neglected on March 9, 2018. This occurred after Mother sent the children to live with a friend in Texas and Grandmother took the children to Tennessee. Mother was hesitant to return to Tennessee, in part, due to her then-outstanding warrants in this state. In the 27 months between DCS taking custody and the trial in this case, Mother did not provide any financial support for the children, she failed to address her trauma as a domestic violence victim, and she failed to provide DCS with sufficient proof of adequate and stable housing.[10] Like the trial court, we find Mother's reasons for these shortcomings to be unpersuasive.

Further, this court has previously interpreted this subsection to include "other conditions" that may not have originally contributed to the children entering custody. In *In re Audrey S.* we stated:

> The statute refers both to the original "conditions which led to the child's removal" and to "other conditions" which in all reasonable probability would cause a child to be subjected to "*further* abuse and neglect."

*In re Audrey S.*, 182 S.W.3d 838, 872 (Tenn. Ct. App. 2005) (citation omitted) (citing Tenn. Code Ann. § 36-1-113(g)(3)(A)(i)). To protect the children from *further* neglect in the future, it is appropriate for this Court to consider conditions that persist, even if they did not contribute to the children's removal in May 2017. Such conditions include Mother's continued legal trouble, her lack of follow-through on assessment recommendations, and her "cavalier" and unapologetic drug use one month prior to trial. These conditions relate directly to Mother's ability and willingness to provide adequate support and care for the children. They did not contribute to the children entering DCS custody, but their continuance may subject the children to future neglect if they are placed in Mother's custody. Considering the children were in DCS custody for 27 months prior to trial, we must agree with Mr. Taylor that additional time is unlikely to result in Mother remedying any of these conditions.

Pursuant to subsection (iii) in section 36-1-113(g)(3)(A), we also find that the continuation of Mother's relationship with the children would "greatly diminish[] the child[ren]'s chances of early integration into a safe, stable, and permanent home[.]" Tenn. Code Ann. § 36-1-113(g)(3)(A)(iii). Mr. Taylor and Ms. Cupp both testified at length that the best outcome for the children would be to remain in their current foster homes rather than be subject to further movement and uncertainty. Ms. Cupp also stated

---

[10] Again, Mother presented a written lease at trial to show she obtained adequate housing for herself and the children. However, the lease alone does not prove Mother obtained adequate housing, and the face of the lease raises numerous concerns as to whether the children would be allowed to live at the property.

- 13 -

that the children become avoidant or agitated when Mother is brought up in therapy sessions. Based on this testimony, DCS has shown that furthering Mother's relationship with the children is likely to diminish their chances of entering a safe and permanent home where they can continue to recover from their past trauma.

Based on the forgoing reasoning, we affirm the trial court's finding that grounds for termination exist under Tennessee Code Annotated section 36-1-113(g)(3)(A) for persistent conditions.

### 4. Failure to Manifest a Willingness and Ability to Parent

Tennessee Code Annotated section 36-1-113(g)(14) states another ground for termination when two elements are shown by clear and convincing evidence. *In re Dylan S.*, No. E2108-02036-COA-R3-PT, 2019 WL 5431878, at *7 (Tenn. Ct. App. Oct. 23, 2019); *In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018). First, the petitioner must prove that the parent "failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." *In re Keilyn O.*, 2018 WL 3208151, at *8. Second, it must prove "that placing the children in [the parent's] custody would pose a risk of substantial harm to the physical or psychological welfare of the children by the same quantum of proof." *Id.*

This ground for parental termination is relatively new, added to section 36-1-113(g) in July 2016. *See* Tenn. Code Ann. § 36-1-113. In a short time, a split of authority has developed in this Court regarding the first element in the section. *See In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *9–10 (Tenn. Ct. App. Oct. 29, 2018) (detailing the differing approaches).[11] However, this split of authority is only relevant "in cases where a parent manifests a willingness to assume custody and financial responsibility but is simply unable to do so." *In re Dylan S.*, 2019 WL 5431878, at *8. "[W]here the parent has manifested neither a willingness nor an ability to assume custody and responsibility, this Court has upheld termination of the parent's parental rights on this ground." *Id.* (citing *In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *15 (Tenn. Ct. App. Jan. 31, 2019); *In re Colton B.*, 2018 WL 5415921, at *9–10). Based on the facts presented in this case, we do not find the need to address the split of authority that has developed on this ground. During the 27 months the children had been in DCS custody, Mother failed to manifest either a willingness or

---

[11] Certain panels have required "the petitioner to prove both an inability *and* an unwillingness of the parent to assume custody or financial responsibility for the child." *In re Colton B.*, 2018 WL 5415921, at *9. Others have required proof "that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the child." *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *14 (Tenn. Ct. App. June 20, 2018).

an ability to parent the children. Mother's recent choices show she is living a transient and erratic lifestyle despite returning to Tennessee. *See In re Jonathan M.*, No. E2018-00484-COA-R3-PT, 2018 WL 5310750, at \*5 (Tenn. Ct. App. Oct. 26, 2018) (stating "[a]bility focuses on the parent's lifestyle and circumstances"). Furthermore, her conduct since the children entered DCS custody shows she is unwilling to parent the children in a suitable manner. *See id.* (stating "[w]hen evaluating willingness, we look for more than mere words"). *See also In re Amynn K.*, 2018 WL 3058280, at \*15 (stating despite the parent's repeated statements that he is willing to parent, "[his] actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to [his] actual willingness to assume custody or financial responsibility for the Child").

Mother used illicit drugs only a month prior to trial; she executed a lease only twelve days before trial, which fails to list the children as occupants; she did not substantially comply with the permanency plan; and she has not provided any financial support for the children since they left her physical custody. Mother's actions during the two visits with the children in December 2017 and September 2018 further show she is unwilling to establish a parental connection. In December 2017, Mother admits that the middle daughter "pretty much stayed in a corner and played with [another sibling]." For the majority of the September 2018 visit, Mother sat in a corner "Facetiming" another child rather than spending time with the children that are the subject of this case. Mother's actions and lifestyle choices show that she has not manifested an ability or willingness to parent the children. As a result, we find that DCS has met its burden of proof by clear and convincing evidence on the first element of this ground. *See In re Keilyn O.*, 2018 WL 3208151, at \*8.

Focusing on the second element, we conclude that placing the children in the custody of Mother would subject them to a risk of substantial physical and psychological harm. The evidence presented by DCS shows that another change in households is likely to disrupt the children's growth and well-being. Mr. Taylor and Ms. Cupp both testified regarding the children's improvements since entering custody. They also stated that removing the children from their current placements would likely be harmful to the children's emotional and psychological well-being. Therefore, we affirm the trial court's finding regarding failure to manifest an ability or willingness to parent.

### B. Best Interest of the Children

"When at least one ground for termination of parental rights has been established, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest." *In re Navada N.*, 498 S.W.3d at 606 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). To make this determination, courts consider and apply the factors listed in Tennessee Code Annotated § 36-1-113(i). *Id.* at 607. The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).[12]

---

[12] This subsection of the Code appears the same as it did on the date of the filing of the subject petition in April 2019.

"The relevancy and weight to be given each factor depends on the unique facts of each case." *In re Audrey S.*, 182 S.W.3d at 878. The list is nonexclusive, *In re Carrington H.*, 483 S.W.3d at 523, and a court is not required "to find the existence of each factor before it concludes that terminating a parent's rights is in the child's best interest." *In re Matthew T.*, 2016 WL 1621076, at *16 (citing *In re Dominique L.H.*, 393 S.W.3d 710, 719 (Tenn. Ct. App. 2012)). The determination "must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194. "[W]hen the interests of the parent and the child conflict, courts are to resolve the conflict in favor of the rights and best interest of the child." *In re Navada N.*, 498 S.W.3d at 607 (citing Tenn. Code Ann. § 36–1–101(d)).

As we have discussed at length, Mother has not shown that her new lease or present lifestyle enable her to provide a stable and suitable home for the children. This weighs against reunification under factor (1). Regarding factor (2), the steps Mother has taken to comply with the requests of DCS and the permanency plan are minor compared to what has been asked of her. Mr. Taylor testified to the scheduling and rescheduling of assessments and therapy as well as the efforts he went to in order to help Mother satisfy her responsibilities. In the end, it does not appear that she has made "a lasting adjustment" after "reasonable efforts" made by DCS. As for factor (3), Mother visited the children only twice after they left her physical custody. The only other contact that she appears to have made was a phone call on R.W.'s birthday. Christmas and birthday gifts were not exchanged, and regular phone calls were not made. Upon returning to Tennessee, Mother did not immediately request visitation. It was not until April 2019 that DCS filed a Petition to Terminate Parental Rights, halting visitation. In the absence of regular visitation, factor (3) weighs in favor of termination.

In relation to factors (4), (5), and (6) collectively, Mr. Taylor's and Ms. Cupp's testimony on the children's relationship (or lack thereof) with Mother and their growth since entering DCS custody is compelling. Mr. Taylor stated that when the children entered DCS custody, "they were starkly different [children] than the kids that [DCS is] working with today." He further explained that the middle daughter has made "a complete 180," recently receiving a public service award at her school; R.W. continues to "transition[] into a completely lovely young lady;" and the youngest is now a polite and respectful child. Mr. Taylor also testified that the children continue to receive therapy every other week and that the constant transitioning between homes is frustrating to them. Ms. Cupp testified on the lack of connection the children have with Mother. She stated none of the children bring her up during therapy, and when Ms. Cupp would do so, the children became avoidant. Ms. Cupp was pleased with the progress the children are making and stated a change in caregivers would be "very harmful" to the two youngest daughters' psychological condition.

In contrast to the children's current placements, Mother and the children appear to lack a meaningful connection or bond. Again, the children make efforts to avoid talking

about Mother while in therapy and often react negatively when she is discussed. Mother also had trouble remembering at least one of the children's birthdays both at trial and when completing her parenting assessment. She claimed her forgetfulness was because she had "so many kids and grandkids [she] can't keep track of them all." Mother's own attorney admitted that Mother's relationship with the children is "not great." Based on the lack of a meaningful connection between Mother and the children, the children's positive growth in their current placements, and the potential for psychological or emotional harm if Mother was to regain custody, we find that factors (4), (5), and (6) show that parental termination is in the best interest of the children.

We find the record is devoid of sufficient evidence to properly address factors (7) and (8), but that is not fatal to this best interest determination. *See In re Matthew T.*, 2016 WL 1621076, at *16.

Regarding factor (9), Mother admits that she has not provided any financial support for the children since they left her physical custody. Her explanation that she called the child support office but "[didn't] technically [] have a case" to pay on is unpersuasive. Even prior to DCS taking custody of the children, there is no proof that Mother made any efforts to provide financial support to either Grandmother or her friend in Texas. Factor (9) also weighs in favor of termination.

Taken as a whole, we find the application of the factors listed in Tennessee Code Annotated section 36-1-113(i) shows it is the best interest of the children to terminate Mother's parental rights.

## V. CONCLUSION

For the foregoing reasons, we affirm the trial court's order terminating Mother's parental rights to the children. We affirm the trial court's finding that there is sufficient evidence to support the grounds of abandonment for failure to establish a suitable home, substantial noncompliance with the permanency plan, persistence of conditions, and failure to manifest an ability and willingness to parent. We affirm the trial court's conclusion that it is in the children's best interest to terminate Mother's parental rights. Thus, we affirm the trial court's ultimate decision to terminate Mother's parental rights to these children.

This case is remanded to the trial court for such further proceedings as may be necessary and are consistent with this Opinion. Costs of this appeal are assessed against Appellant, Alaina W., for which execution may issue if necessary.

CARMA DENNIS MCGEE, JUDGE